**POLSINELLI LLP**
CHRIS HOLM (SBN 249388)
cholm@polsibelli.com
WES M. KLIMCZAK (SBN: 294314)
wklimczak@polsinelli.com
2049 Century Park East, Suite 2900
Los Angeles, CA 90067
Telephone: (310) 556-1801
Facsimile: (310) 556-1802

Attorneys for Plaintiff
UPAID SYSTEMS, LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| UPAID SYSTEMS, LTD., | CASE NO. 18-2551 |
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT AND DEMAND FOR JURY TRIAL** |
| v. | |
| MONTEREY EXPRESS WASH (CORPORATE ENTITY STATUS UNKNOWN), | |
| Defendant. | |

Plaintiff Upaid Systems, Ltd. ("Upaid" or "Plaintiff") complains of

Defendant Monterey Express Wash, corporate entity status unknown

("Defendant"), as follows:

## NATURE OF LAWSUIT

1.     This is a claim for patent infringement arising under the patent law of

the United States, Title 35 of the United States Code.

## PARTIES

2.     Plaintiff Upaid is a business company organized under the law of the

British Virgin Islands. Its principal place of business is located at Trident

Chambers, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

3.     Since 1998, Upaid has been innovating and developing new payment products around the world.  Upaid was one of the first companies to offer a mobile phone service for credit card payment and secure transaction processing.  Through years of in-house research and development, Upaid's innovations in the field of transaction technology has resulted in almost sixty patents world-wide (eight in the United States alone), the most recent of which was granted by the European Patent Office on October 31, 2017.  The patent asserted in this Complaint, U.S. Patent No. 8,976,947 ("the '947 patent"), is just one of these many patents awarded to Upaid in the field of transaction technology, a true and correct copy is attached as **Exhibit A**.

4.     Upon information and belief, Defendant Monterey Express Wash, a business with a corporate entity status unknown, operates a laundromat located at 23 Soledad Drive, Monterey, California 93940

5.     According to information available about Defendant's laundromat, located at https://www.montereyexpresswash.com/laundromat-services/ (attached as **Exhibit B**), Defendant uses Card Concept Inc. products, including the LaundryCard, FasCard, and/or FasCard Mobile App systems.

## JURISDICTION AND VENUE

6.     Upaid's claim for patent infringement against Defendant arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq*., including 35 U.S.C. §§ 271 and 281.  Consequently, this Court has original subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 (federal question) and 1338(a) (patent infringement).

7.     Defendant is subject to the general personal jurisdiction of the Court because it is registered to do business and maintains its headquarters in California.

8.     Defendant is subject to specific personal jurisdiction of this Court because, upon information and belief, Defendant has done business in this judicial district, has committed and continues to commit acts of patent infringement within this judicial district and has harmed and continues to harm Upaid in this judicial

district by, among other things, using Card Concepts Inc.'s LaundryCard, FasCard and/or FasCard Mobile App systems.

9.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b), (c), (d) and/or 1400(b) because, upon information and belief, Defendant is subject to personal jurisdiction and has committed acts of patent infringement within this district.

## GENERAL BACKGROUND OF THE INVENTION

10.     Beginning in 1998, Upaid has provided centralized mobile payment processing platforms for banks, mobile operators, and merchants utilizing a plurality of different networks. Upaid has also offered "Text-cheque," SMS bill payment and authorization products; along with an enhanced platform (e.g., Unified Payment Platform), a mobile payments service for mobile operators, financial services organizations and merchants. Upaid has also provided mobile applications, such as recharge of prepaid accounts through SMS, electronic bill payment and presentment, and billing for mobile content. In addition, Upaid has offered marketing downloads and prepaid top-up services; along with consulting, scoping, project management, technical support, and training services.

11.     Since, the conception and development of Upaid's enhanced platform in 1998, Upaid has engaged in strategic partnerships around the world. For over 3 years, Upaid offered "on demand" m-commerce (electronic commerce conducted on mobile phones) capabilities to IBM's customers and had a project office within IBM. IBM executives selected Upaid as the preferred service provider for its electronic payment platform, which transitioned into IBM's mainstream payment platform. Upaid also had a strategic partnership with Visa International related to the Visa Mobile Service, which utilized Upaid's mobile recharge and mobile bill-pay products. Upaid's mobile bill-pay product (also known as "Text cheque") was utilized by Cofinoga (owned by BNP Paribas) to enable their customers to utilize short message services (SMS) for bill pay and balance information. Upaid also

worked with Brazil's leading mobile operators and banks to enable recharge transactions throughout the country servicing over 50 million users and processing nearly 2 million transactions a month.

12.     Upaid was founded in 1997 by Simon Joyce. During this time, Mr. Joyce realized the fragmentation of networks between the carriers was a bottleneck for innovation. Since the networks were fragmented and there was no interoperability between the networks, each carrier offered a set of communication services that could operate on their specific network, and not in the other carriers' networks. In one such example, a mobile telephone user on one carrier's network could not send a text message to a mobile telephone user on another carrier's network because the networks (and services) operated as closed data networks, also known as walled gardens. In another such example, a pre-paid mobile telephone user was unable to use international roaming on a pre-paid mobile telephone service and, users of pre-paid mobile services, were also unable to check remaining pre-paid credit balance during calls in real-time because the systems in place could only check a user's credit at the start of a call and could not actually stop the call when the user ran out of credit. In situations where a user's telephone was stolen, a pre-paid SIM could be put into the stolen telephone (no SIM locking at the time) and a person could call an expensive international number and leave the call established without the call being cut off once the pre-paid credit on that SIM was used.

13.     Mr. Joyce realized the need to improve the above example limitations (along with other limitations) and the lack of interoperability between these networks, in order to drive innovation. Mr. Joyce's solution was to create an enhanced platform, external to these carrier networks, that was configured to operate communication services and transactions for these carrier networks. Development of this enhanced platform was carried out at a cost of over 12 million dollars in research and development by Upaid.

14.     Mr. Joyce is a named inventor on the patent in this suit, along with a

plurality of other Upaid patents on which he is also a named inventor. The inventors, including Mr. Joyce, invented machines, systems, computer programming structures and methods, at least as early as September 1998, related to advanced communication services, including but not limited to: accepting, processing, verifying, and charging, over a plurality of different external networks via an enhanced platform. The provision of these services by an enhanced platform over a plurality of different external networks represented a significant improvement over the prior art, thereby encompassing patentability distinct systems and methods for advanced communication services, including pre-authorized communication services and transactions.

15.     The term "pre-authorized communication services and transactions" (sometimes referred to as "advanced communication services") are any such online services and transactions, such as e-commerce, information inquiry, financial, communication, entertainment, etc. Embodiments of the patent claims include a platform for providing the pre-authorized communication services and transactions and can constitute a complete operation system for use by operators, customers, and the like. The platform itself, along with other components of the system are connected by the plurality of networks (external to the platform), including, but not limited to landline communication networks, wireless communication networks, wide area networks, global computer networks, cable networks, satellite networks, etc. The Upaid patent is not limited to certain networks or pre-authorized communication services and transactions, but the inventions of the patents were developed primarily with pre-authorized communications services and transactions via a platform and external networks in mind, and the use of these terms help describe what was done in developing the inventions.

**EARLY PRECURSORS OF THE UPAID PATENT INVENTION**

16.     At one time, Upaid developed a platform for pre-authorizing communication services and transactions, which are the invention(s) described in

the '947 patent. The products were the IN TOUCH Mass-Market Prepaid Calling System, NetManager and CallManager, copies of the design documents are attached hereto as **Exhibit C.**

17.    For a number of reasons, as illustrated above, it is preferable for the platform and advanced communication services to be able to operate over a plurality of external networks, some of which were not designed or configured to handle the type of data being sent from the platform and/or advanced communication services.

18.    Upaid began development of its patented technology in the late 1990s, including its products: IN TOUCH Mass-Market Prepaid Calling System, NetManager and CallManager. NetManager is an enhanced platform for providing a complete suite of intelligent network switching features over a plurality of different networks. CallManager is a complete prepaid solution addressing wireline and wireless networks.

19.    NetManager was built for use in server computers running Windows NT 5.0 Server and utilizing COM based 3-tier software features, ADO/OLE DB based database connectivity and SQL Service 6.5/7.0 database server.

20.    Component Object Model (COM) is a binary-interface standard for software components introduced by Microsoft in 1993. It is used to enable inter-process communication object creation in a large range of programming languages. The COM software architecture enabled NetManager to be built from binary software components. The COM software architecture, enabled NetManager to integrate binary executables from different vendors, written in different parts of the world and at different times, to interoperate. NetManager also offers digital and analog interface support, along with Standard R2 MF signaling and Advanced Intelligent Networks support. Figure 1 shows an example of the NetManager Software Architecture.



**Figure 1: NetManager Software Architecture**

21.    NetManager is part of the enhanced platform configured to provide intelligent network switching features. NetManager is transparent to users and enables operation of advanced communication services over "legacy" switches, thus avoiding upgrading to "new generation switches." Figure 2 shows an example of the technologies offered between the systems.

| Features CLI/DNIS Based | New Generation Switches | Legacy Switches | Net Manager™ |
|---|---|---|---|
| Abbreviated Dialing | ✓ | ✓ | ✓ |
| Password Service | ✓ | ✓ | ✓ |
| Automatic Alarm | ✓ | ✓ | ✓ |
| Conference Call | ✓✓ | x | ✓ |
| Multiline Hunting | ✓✓ | x | ✓ |
| Calling Line Identification Presentation | ✓✓ | x | ✓ |
| Calling Line Identification Restriction | ✓✓ | x | ✓ |
| Call Forward - Busy | ✓✓ | x | ✓ |
| Call Forward - No reply | ✓✓ | x | ✓ |
| Call Forwarding- Unconditional | ✓✓ | x | ✓ |
| Call Forward - Selective | ✓✓ | x | ✓ |
| Call Accept - Selective | ✓✓ | x | ✓ |
| Call Back | ✓✓ | x | ✓ |
| Distinctive Ringing | ✓✓ | x | ✓ |
| Network Voice Mail | ✓✓ | x | ✓ |
| Interception Service | ✓✓ | x | ✓ |
| Call Forward - Busy | ✓✓ | x | ✓ |
| Call Forward - No reply | ✓✓ | x | ✓ |
| Default ✓ | Extra Cost ✓✓ | Not Avlbl. x | |

**Figure 2: Available Features for Switches and NetManager**

22.    Advanced communication services are not available on the legacy

switches and generally cost extra for the new generation switches. NetManager, however, offered the advanced communication services utilizing the legacy switches (and networks) via the enhanced platform. The advanced communication services can include telephony services and online services, including pre-authorized online transactions, such as e-commerce, information inquiry, communication, entertainment, etc.

23.    CallManager includes two main components, Switch Manager and Card Manager. Switch Manager provides advanced communication services and was built for use in server computers running Windows NT 5.0 Server. Card Manager provides a complete operations support system that is Open Database connectivity (ODBC) compliant. Figure 3 illustrates dataflow between the Switch Manager and Card Manager for providing advanced communication services.



**Figure 3: Dataflow between Switch Manager and Card Manager**

24.    CallManager can also maintain external service information, for example, services offered by external carriers, such as telephony, fax, electronic mail, e-commerce, etc. Figure 4 is an example graphical user interface illustrating external services maintained by CallManager.



**Figure 4: Graphical User Interface of CallManager External Services**

25.    CallManager also offers pre-authorized payment solutions, for example, for each user account. The pre-authorization can include a deposit amount, credit limit, credit limit left, current balance, last paid debt, etc. Figure 5 is a graphical user interface of payments maintained by CallManager.



**Figure 5: Graphical User Interface of CallManager Payments**

26.    The functionality of NetManager and CallManager could also include a remote access server for providing advance communication services over the Internet, etc. Incoming inquires could be routed to the remote access server to enable pre-authorized online transactions, such as e-commerce, information inquiry, financial, communication, entertainment, etc.

## DEVELOPMENT OF THE PATENTED INVENTION

27.    Upaid's first step in solving the problems present in the prior art circa 1998 was to develop the above-mentioned products. Mr. Joyce, one of the inventors of '947 patent, had the insight and wherewithal to break from conventional communication services and create advanced communication services through existing communication switches even in those circumstances in which the hardware communication switch was not configured to provide such communication services. In the late 1990s and even the early 2000s, most Internet access in homes was provided via dial-up carriers. That is, networks that were slow, unreliable and unable to service advanced communications services. The invention described in the '947 patent enabled these advanced communication services to be implemented on networks without significant infrastructure upgrades/replacements.

## EXAMINATION AND ISSUANCE OF THE UPAID PATENTS

28.    As is well known, to obtain a patent an inventor must file an application with the United States Patent and Trademark Office ("USPTO"), and in that application must disclose what the inventor invented in sufficient detail such that one of skilled in the art can make and/or use the invention.

29.    Examiners at the USPTO review patent applications to determine whether a claimed invention should be granted a patent. In general, the most important task of a patent examiner is to review the technical information disclosed in a patent application and to compare it to the state of the art. This involves reading and understanding a patent application, and then searching the prior art to determine what technological contribution the application teaches the public. A patent is a

reward for informing the public about specific technical details of a new invention. The work of a patent examiner includes searching prior patents, scientific literature databases, and other resources for prior art. Then, an examiner reviews the claims of the patent application substantively to determine whether each complies with the legal requirements for granting of a patent. A claimed invention must meet patentability requirements including statutory subject matter, novelty, inventive step or non-obviousness, industrial application (or utility) and sufficiency of disclosure. Examiners must apply federal laws (Title 35 of the United States Code), rules, judicial precedents, and guidance from agency administrators.

30. To have signatory authority (either partial or full), Examiners must pass a test equivalent to the Patent Bar. All examiners must have a college degree in engineering or science. Examiners are assigned to "Art Units," typically groups of 8-15 Examiners in the same area of technology. Thus, by way of required background and work experience, Examiners have special knowledge and skill concerning the technologies examined by them and in their particular Art Unit.

31. The basic steps of the examination consist of:

- reviewing patent applications to determine if they comply with basic format, rules and legal requirements;
- determining the scope of the invention claimed by the inventor;
- searching for relevant technologies to compare similar prior inventions with the invention claimed in the patent application; and
- communicating findings as to the patentability of an applicant's invention via a written action to inventors/patent practitioners.

32. Communication of findings as to patentability are done by way of one or more Office Actions in which the Examiner accepts or rejects proposed claims filed by the applicant(s) and provides reasons for rejections. The applicant(s) are then permitted to file a Response to Office Action, in which claims may be amended to address issues raised by the Examiner, or the applicant states reasons

1   why the Examiner's findings are incorrect. If an applicant disagrees with a Final

2   Rejection by an Examiner, the applicant may file an appeal with the Patent Trial

3   and Appeal Board ("PTAB"). If, after this process, the USTPO determines that the

4   application meets all requirements, a patent is duly allowed, and after an issue fee is

5   paid, the patent is issued.

6       33.     A patent duly allowed and issued by the USTPO is presumptively

7   valid and becomes the property of the inventor(s) or assignee(s).

8       34.     A "Continuation Application" is one where, typically after allowance

9   but in any event prior to issuance, the inventor applies for a second, related patent.

10  A Continuation employs the same invention disclosure as the previous, allowed

11  application, but seeks new or different claims. A patent issued on a Continuation

12  Application receives the priority date of the previously allowed patent, but the

13  applicant must disclaim any patent life beyond that of the first allowed patent to

14  which the Continuation seeks priority. The '947 patent is a Continuation of U.S.

15  Patent No. 7,308,087 (the "'087 patent), which is a Continuation of U.S. Patent No.

16  6,714,632 (the "'632 patent), which is a Continuation of U.S. Patent No. 6,381,316

17  (the "'316 patent"), which is a Continuation of U.S. Patent No. 6,320,947 (the

18  "'947 II patent").

19            **<u>EXAMINATION AND ISSUANCE OF THE '947 II PATENT</u>**

20      35.     The '947 II patent was filed on September 14, 1999 and claims priority

21  to two provisional applications (No. 60/100,440 and No. 60/100,470 both filed

22  September 15, 1998). The '947 II patent was examined for over two years from the

23  date of filing of the application on September 14, 1999, through the issue date of

24  November 20, 2001. A true and correct copy of the examination file (referred to as

25  a "file jacket") for the '947 II patent is attached hereto as **Exhibit D**.

26      36.     There were two Examiners involved in examining the application for

27  the '947 II patent, Examiner Quoc Tran ("Examiner Tran") and Supervisor Curtis

28  Kuntz ("Supervisor Kuntz").

37.     As evidenced by the Notice of References Cited, four patents and applications were located and were considered in rejecting the filed claims of the application for the '947 II patent, under 35 U.S.C. §§ 102 and 103, in the First Office Action mailed July 18, 2000. *See* Exhibit D at p. 108-116. Examiner Tran also considered 20 references supplied by the Applicant via Information Disclosure Statements July 7, 2000. *See Id*. at p. 95-102.

38.     In response to the First Office Action, Applicant amended the claims and put forth an introduction to the technology, namely, "[t]he present invention is an advanced intelligent communication method and system using a single, converged enhanced service platform that provides subscriber-requested communication services through existing communication switches even in those circumstances in which the hardware communication switch is not configured to provide such communications services … Advantageously, through the enhanced services communication platform, a non-corporate individual user can use a single universal prepaid card and a single, unified, prepaid account to make a voice call, to transfer and receive internet provided data, and to complete online transactions, over a plurality of networks of different types, using a mobile telephone, a personal computer, or any other suitably enabled communication device anywhere in the world." *See Id*. at p. 117-154.

39.     After the response to the First Office Action was filed, an interview was held with Examiner Quan and Supervisor Kuntz. During the interview, a discussion took place regarding the user request, plurality of different networks as claimed and enhanced communication services. *See Id*. at p. 155-156. After the interview, a supplemental response with claim amendments were filed. *See Id*. at p. 157-176. The application for the '947 II patent was deemed to be in a condition for allowance and subsequently issued. *See Id*. at p. 177-223.

## EXAMINATION AND ISSUANCE OF THE '316 PATENT

40.     The '316 patent was filed on May 9, 2001 and claims priority the '947

II patent. The '316 patent was examined for approximately one year from the date of filing of the application on May 9, 2001 through the issue date of April 30, 2002. A true and correct copy of the examination file (referred to as a "file jacket") for the '316 patent is attached hereto as **Exhibit E**.

41.     The same two Examiners were involved in examining the application for the '316 patent, Examiner Tran and Supervisor Kuntz.

42.     As evidenced by the Notice of References Cited, seven patents and applications were located that were considered in rejecting the filed claims of the application, in the First Office Action mailed July 17, 2001. *See* Exhibit E at p. 80-85. Examiner Tran also considered 91 references supplied by the Applicant via Information Disclosure Statements on October 12, 2001. *See Id.* at p. 104-112.

43.     The First Office Action included a non-statutory obviousness-type double patenting rejection, as being unpatentable over claims 1, 29 and 56 of the '947 II patent. *See Id.* at p. 80-85. Subsequently, the Applicant filed a terminal disclaimer to obviate the double patent rejection on August 1, 2001, along with a supplement Information Disclosure Statement citing six additional patents, which the Examiner considered before issuing an allowance mailed November 29, 2001. *See Id.* at p. 113-114. The issue fee was subsequently paid and the application issued on April 30, 2002. *See Id.* at p. 121-161.

### EXAMINATION AND ISSUANCE OF THE '632 PATENT

44.     The '632 patent was filed on April 3, 2002 and claims priority to the '316 patent. The '632 patent was examined for over two years from the date of filing of the application on April 3, 2002 through the issue date of May 30, 2004. A true and correct copy of the examination file (referred to as a "file jacket") for the '632 patent is attached hereto as **Exhibit F**.

45.     The same two Examiners were involved in examining the application for the '632 patent, Examiner Tran and Supervisor Kuntz, along with Primary Examiner Binh Tieu.

46.     A First Office Action was mailed June 21, 2002. *See* Exhibit F at p. 95-106. Examiner Tran considered 104 references supplied by the Applicant via Information Disclosure Statements on April 3, 2002, along with references from Examiner's search noted in the Notice of References Cited. *See Id*. at p. 85-94; 107. The First Office Action included a non-statutory obviousness-type double patenting rejection, anticipatory and obviousness-type rejections under 35 U.S.C. §§ 102 and 103 rejections, along with allowable dependent claims. *See Id*. at p. 95-106.

47.     In response to the Office Action, claim amendments were made, specifically the allowable dependent claims were integrated into the independent claims. Another Information Disclosure Statement with an additional three international reference was also provided. *See Id*. at p. 109-137.

48.     On December 31, 2002, a Second Office Action was mailed which included non-statutory obviousness-type double patenting rejection, as being unpatentable over claims 1-45 of the '947 II patent and 1-30 of the '316 patent. *See Id*. at p. 151-156. Subsequently, the Applicant filed a terminal disclaimer to obviate the double patent rejection on March 31, 2003, along with clarifying claim amendments and a supplement Information Disclosure Statement (on March 20, 2003) citing four additional patents, which the Examiner considered. *See Id*. at p. 181-182.

49.     The Examiner mailed a Third Office Action on May 6, 2003 with an anticipatory rejection under 35 U.S.C. § 102 to a newly discovered reference. *See Id*. at p. 183-199. In response, further claim amendments were made on June 16, 2003, that is, the platform controls one of the external networks to provide the service/transaction and being outside of the plurality of external networks of different types. *See Id*. at p. 202-216. Subsequently, the Examiner issued a Notice of Allowance. *See Id*. at p. 217-224. Before the application issued, the Examiner considered, on April 2, 2004, a further 12 references via Applicant submitted Information Disclosure Statements. *See Id*. at p. 253-256.

1      50.    The issue fee was subsequently paid and the application issued on

2  March 30, 2004.

3              **EXAMINATION AND ISSUANCE OF THE '087 PATENT**

4      51.    The '087 patent was filed on October 15, 2003 and claims priority to

5  the '632 patent. The '087 patent was examined for over four years from the date of

6  filing of the application on October 15, 2003 through the issue date of December

7  11, 2007. A true and correct copy of the examination file (referred to as a "file

8  jacket") for the '087 patent is attached hereto as **Exhibit G**.

9      52.    The same two Examiners were involved in examining the application

10  for the '087 patent, Examiner Tran and Supervisor Kuntz.

11      53.    A First Office Action was mailed March 24, 2005. *See* Exhibit G at p.

12  375-384. Examiner Tran considered 138 references supplied by the Applicant via

13  Information Disclosure Statements on October 15, 2003, November 24, 2003, and

14  June 29, 2004 along with references from Examiner's search noted in the Notice of

15  References Cited. *See Id*. at p. 385-465. The Examiner also performed a search for

16  relevant references using the EAST system, specifically searching classes 379

17  (subclasses: 114.01, 114.03, 114.05, 114.17, 114.2, 144.05, 144.06 and 114.05) and

18  455 (subclasses: 405 and 406). *See Id.* at p. 399. The First Office Action included

19  anticipatory and obviousness-type rejections under 35 U.S.C. §§ 102 and 103 based

20  on combinations of several pieces of prior art, all for machines or methods, or parts

21  of machines or methods, for telecommunication services. *See Id.* at p. 375-384. On

22  information and belief, it is the practice of the USPTO not to cite excessive

23  cumulative art, in other words, in this instance, the art cited is representative of

24  considerable other art located by the USPTO and not cited. Further on information

25  and belief, it is the practice of the USPTO to discuss in its Office Actions those

26  pieces of art that best represent the cited art. The face of the '087 patent lists

27  hundreds of prior art references considered by the Examiner in the prosecution of

28  the '087 patent.

COMPLAINT FOR
PATENT INFRINGEMENT                        - 16 -

54.     In response to the First Office Action, claim amendments were made, specifically defining the "accounts" as "pre-authorized" and that the additional funds are "a real-time transaction." *See Id.* at p. 355-372.

55.     A Second Office Action was mailed November 15, 2005, and included obviousness-type rejections under 35 U.S.C. § 103 of the claims. *See Id.* at p. 338-350. The Examiner, performed an updated search on the EAST system on November 13, 2005. *See Id.* at p. 353. Subsequently, the Applicant filed further claim amendments in a Request for Continued Examination (RCE) focusing on "a platform connected to a plurality of networks" and the pre-authorized account "used in paying for at least one communication service or transaction, provided or consummated, respectively via at least one of the networks of different types which are external to the platform" on May 18, 2006. *See Id.* at p. 325-336.

56.     On June 21, 2006, the Examiner updated his prior art search on the EAST system. *See Id.* at p. 332. The Examiner did not find any new relevant prior art and mailed an Ex Parte Quayle Action, on June 29, 2005, in which claims were allowed except for formal matters, specifically, a non-statutory double patenting rejection with the claims being unpatentable over claims 1-50 of the '632 patent. *See Id.* at p. 316-320. On November 29, 2006, Applicant filed a terminal disclaimer, which was approved on December 18, 2006. *See Id.* at p. 311-314.

57.     On February 8, 2007, the Examiner updated the prior art search on the EAST system. *See Id.* at p. 86-87. The Examiner did not find any new relevant prior art and mailed a Notice of Allowance on February 23, 2007. *See Id.* at p. 75-78. On May 23, 2007, Applicant filed an RCE along with new claims 57-64. *See Id.* at p. 55-65. The Examiner performed yet another prior art search on the EAST system and, again, did not find any new relevant prior art and mailed another Notice of Allowance on February August 8, 2007. *See Id.* at p. 45-51. The issue fee was paid, by Applicant, on October 30, 2007 and the application subsequently issued as a patent on December 11, 2007. *See Id.* at p. 8-9.

COMPLAINT FOR
PATENT INFRINGEMENT                              - 17 -

## EXAMINATION AND ISSUANCE OF THE '947 PATENT

58.    The '947 patent was filed on October 31, 2007 and claims priority to the '087 patent. The '947 patent was examined for over seven years from the date of filing of the application on October 31, 2007 through the issue date of March 10, 2015. A true and correct copy of the examination file (referred to as a "file jacket") for the '947 patent is attached hereto as **Exhibit H**.

59.    The same two Examiners were involved in examining the application for the '947 patent, Examiner Tran and Supervisor Kuntz.

60.    On September 3, 2008, the Examiner performed a prior art search on the EAST system, specifically, searching classes 379 (subclasses: 114.01, 114.03, 114.05, 114.15, 114.16, 114.17, 114.2, and 144.08) and 455 (subclasses: 405 -408). *See* Exhibit H at p. 665. The Examiner did not find any relevant art and mailed an Ex Parte Quayle Action, in which claims were allowed except for formal matters, specifically, a non-statutory double patenting rejection with the claims being unpatentable over claims 1-26 of the '087 patent and claims 1-50 of the '632 patent. *See Id*. at p. 655-661.

61.    Prior to a response to the Ex Parte Quayle Action, Applicant filed a lawsuit against Satyam Computer Services in the Eastern District of Texas Marshal Division (2-07-CV-114) related to inventor declarations provided by Satyam Computer Services. Applicant petitioned the USPTO to suspend prosecution of the '947 patent during the above-styled lawsuit. *See Id.* at p. 567-568; 505-508; 463-489; 221-341. By April 30, 2014, the above-styled lawsuit was settled and Applicant withdrew its petition to suspend examination and filed a Terminal Disclaimer. *See Id.* at p. 213-216. A Notice of Allowance was mailed October 24, 2014, the issue fee was paid January 23, 2015 and the '947 patent issued on March 10, 2015. *See Id.* at p. 148-154.

62.    On or about June 9, 2014, during the prosecution of the '947 patent and before the Notice of Allowance was mailed, the *Alice Corp. v. CLS Bank*

*International*, 573 U.S. __, 134 S. Ct. 2347 (2014) opinion was issued from the United States Supreme Court. On or about December 16, 2014, before the '947 patent issued or the issue fee was paid, the USPTO published in the Federal Register, its Interim Guidance on Patent Subject Matter Eligibility ("Interim Eligibility Guidance") expressly for use by USPTO personnel in determining subject matter eligibility under 35 U.S.C. 101 in light of recent US Supreme Court cases, specifically including *Alice Corp*, a copy of the published Interim Eligibility Guidance is attached hereto as **Exhibit Q**. The December 2014 Interim Eligibility Guidance was preceded by a number of other guidances, as stated in the publication of the Interim Eligibility Guidance. On information and belief, all personnel in the USPTO, including Examiners Tran and Kuntz, were well aware of *Alice Corp.*, the US Supreme Court cases that preceded Alice, and of the Interim Eligibility Guidance and preceding guidances.

63.    Upon information and belief, subsequent the release of the December 2014 Interim Eligibility Guidance, pending applications, including applications where a Notice of Allowance had been mailed, were reviewed under the Guidance and, where appropriate, the Notice of Allowances were rescinded and prosecution re-opened. Examiner Tran and the USPTO made no rejection of any of the claims of the '947 patent for subject matter eligibility, and on information and belief did not regard the subject matter of the claims as directed to any abstract idea or ineligible subject matter. *See* Exhibit H.

## **EXAMINATION AND ISSUANCE OF THE '377 PATENT**

64.    The '377 patent was filed on December 23, 2014 and claims priority to the '947 patent. The '377 patent was examined for almost two years from the date of filing of the application on December 23, 2014 through the issue date of August 30, 2016. A true and correct copy of the examination file (referred to as a "file jacket") for the '377 patent is attached hereto as **Exhibit I**.

65.    The same two Examiners were involved in examining the application

1   for the '377 patent, Examiner Tran and Supervisor Kuntz.

2       66.     On September 16, 2015, the Examiner performed a prior art search to

3   "update search from parent cases" and "updated EAST," specifically, searching

4   classes 379 (subclasses: 114.01, 114.03, 114.05, 114.15-114.17, 114.2, and 144.08)

5   and 455 (subclasses: 405-408). *See* Exhibit I at p. 164. The Examiner also

6   performed a CPC-Search using Symbols H04M15/00, 68, 8038, 854 and

7   G06Q20/00, 32, 347. *Id*. The Examiner was also aware of the hundreds of

8   references found and/or provided in the parent applications. The Examiner did not

9   find any relevant art and mailed an Ex Parte Quayle Action, in which claims were

10  allowed except for formal matters, specifically, a 35 U.S.C. § 101 rejection where

11  the scope of the claim "can be a signal or carrier wave" and a non-statutory double

12  patenting rejection with the claims being unpatentable over claims 1-55 of the '947

13  patent. *See Id*. at p. 156-162. The Examiner did not put forth any subject matter

14  eligibility rejections regarding *Alice Corp.* or using the December 2014 Interim

15  Eligibility Guidance. *See* Exhibit I. Upon information and belief, Examiner Tran

16  and Supervisor Kuntz did not regard the subject matter of the claims as directed to

17  any abstract idea or ineligible subject matter.

18      67.     In response to the Ex Parte Quayle Action, Applicant amended the

19  claims to include "non-transitory" to overcome the 35 U.S.C § 101 rejection and

20  filed a Terminal Disclaimer. *See Id.* p. 69; 143-152. On March 14, 2016, Applicant

21  filed an RCE to file an updated Application Data Sheet, Corrected Filing Receipt

22  and consideration of an Information Disclosure Statement including over 170

23  references. *See Id*. at 46-56; 69-82. Upon review of the references and updating the

24  prior art search, the Examiner issued a Notice of Allowance on April 26, 2016 and

25  the '377 patent issued on August 30, 2016. *See Id*. at p. 4-31.

26  **IMPROVEMENTS AND PROBLEMS SOLVED BY THE '947 PATENT**

27      68.     The invention(s) disclosed in the '947 patent are improvements over

28  the prior art. The '947 patent enables the operation of advanced communications

services regardless of equipment or network hardware limitations.

69.     The invention(s) disclosed in the '947 patent improve the functions of the advanced communications services and the functions of the external networks on which the advanced communications services operate, including but not limited to those described in ¶¶ 10-27 above.

70.     The invention(s) disclosed in the '947 patent enable advanced communication services, which are normally dependent on the carriers' (e.g., network) equipment and thus restricted by the carriers' equipment, to operate over the carriers' equipment which the advanced communication services cannot normally operate. The ability to utilize advanced communication services, regardless of the user's location, is highly desirable. For example, a user may have access depending on the city or country they are located, or may have access at their place of business, but not their residence. At the time of the invention, the industry solution to this problem was to upgrade operating systems, software and hardware that can facilitate the operation of the advanced communication services. The industry solution was time consuming, took substantial effort and was very expensive. However, instead of upgrading and replacing the operating systems, hardware and software, the '947 patent improved the operation of the carriers' equipment and networks by enabling the advanced communication services to operate on the carrier's equipment and networks via Upaid's enhanced platform.

71.     Another object and advantage of the present invention is it allows connectivity through a plurality of external networks of different types that are external to the enhance platform.

72.     The invention(s) disclosed in the '947 patent and the claims thereof, represent new, novel and useful improvements over the prior art.

73.     The '947 patent, having been duly examined, allowed, and issued, for which Upaid paid substantial fees to the USPTO, represent property rights of Upaid and Defendant has, as herein set forth, infringed those rights. Upaid estimates that

1   the research and development cost of bringing the inventions to the point of

2   reduction to practice and creating the end product that it was able to bring to market

3   was over $12 million.

4   ## COUNT 1

5   **PATENT INFRINGEMENT OF UNITED STATES PATENT NO. 8,976,947**

6   74.   Plaintiff incorporates by reference the allegations contained in the

7   foregoing paragraphs.

8   75.   Upaid is the named assignee of, owns all right, title and interest in, and

9   has standing to sue for infringement of the '947 patent, entitled "Enhanced

10  Communication Platform and Related Communication Method Using the

11  Platform," which issued on March 10, 2015 (a true and correct copy is attached as

12  **Exhibit A**).

13  76.   The '947 patent claims, among other things, a method for pre-

14  authorized communication services and transactions using computer networks; a

15  non-transitory machine-readable storage medium having encoded thereon program

16  code; a user communication device configured to communicate with a transactions

17  platform; a method of crediting a pre-authorized account of a user; a system for

18  crediting an account of a user of a transceiver who has another account controlled

19  by a separate system; a platform outside of external networks of different types and

20  connectable to a transceiver of a user, a billing platform and another platform; and a

21  platform configured to provide communication services and change amounts in

22  accounts associated with users.

23  77.   The '947 patent solves a problem with the art that is rooted in

24  computer technology that uses computer networks. The '947 patent does not merely

25  recite the performance of some business practice known from the pre-Internet world

26  along with the requirement to perform it on the Internet.

27  78.   Upon information and belief, Defendant owns and operates a laundry

28  center at 23 Soledad Drive, Monterey, CA 93940 with approximately 18 washing

COMPLAINT FOR
PATENT INFRINGEMENT                          - 22 -

machines and 20 drying machines, each washing and drying machine using automated payment systems, specifically, Card Concepts Inc.'s LaundryCard, FasCard, and/or FasCard Mobile App systems.  Photographs of Card Concepts Inc.'s FasCard and X-Charger systems in use at Defendant's laundry center are attached as **Exhibit J**.

79.     The FasCard system can operate as a stand-alone system but can also operate in conjunction with an application downloaded and installed on a customer's smartphone. The mobile application embodiment of the FasCard system is referred to herein as the "FasCard Mobile App" system. Collectively, the LaundryCard, FasCard and FasCard Mobile App systems are referred to collectively as the "Accused Systems."

80.     The LaundryCard system focuses on automating a laundromat by eliminating coin, handling all cash collections, employee management, equipment service and store marketing. According to Card Concepts Inc.'s website, www.laundrycard.com/products (attached as **Exhibit K**), "LaundryCard™ has been successfully installed in over 800 laundromats. This system focuses on automating [one's] laundromat by eliminating coin, handling all cash collections, employee management, equipment service, store marketing and much more."

81.     The FasCard system accepts any combination of coins, credit or debit cards, and loyalty card for use in laundromats as well as other vending machines. According to Card Concepts Inc.'s website, www.laundrycard.com/products, "FasCard is designed to meet the needs of laundries of all sizes. Laundromats and multi-housing laundry rooms will benefit from this cost-effective system designed to accept any combination of coins, credit or debit cards, and loyalty cards." *See* **Exhibit K**

82.     The FasCard Mobile App system allows customers to access FasCard through their smartphones. According to Card Concepts Inc.'s website, www.laundrycard.com/products/fascard/app (attached as **Exhibit L**), "The FasCard

App allows customers to … view machine availability … to remotely start machines … to select a location, [and] to add value to their accounts."

83.     Upaid provided a first notice of the '947 patent to Defendant on April 13, 2018 (a true and correct copy is attached as **Exhibit M**). This first notice identified the '947 patent, provided a copy of the '947 patent, and also served to alert Defendant of its unauthorized use and infringement of the '947 patent. To date, Defendant failed to provide any response, acknowledgement or even request further information of Upaid.

## Defendant's Use of the LaundryCard System

84.     Defendant has infringed and continues to infringe – directly, contributorily, and/or by active inducement – one or more claims of the '947 patent through its unauthorized use, and/or causing to be used, devices and/or systems and methods that embody or practice the inventions claimed in the '947 patent, such as Card Concepts Inc.'s LaundryCard system. For example, the LaundryCard system infringes the '947 patent through its unauthorized use of at least: method claims 1-6, 8 and 10; method claim 11-15, and 17-19; method claim 20; method claim 21; method claim 22; method claim 23; method claim 24; apparatus claims 25-28, 30; apparatus claims 31-34, 36 and 37; method claims 38, 40, 41, 42, 54; method claims 44-47, 55; and, system claims 50 and 52. **Exhibit N** attached hereto provides an explanation of how the LaundryCard system meets the limitations of the aforementioned claims either literally or pursuant to the doctrine of equivalents.

85.     With respect to the apparatus and system claims (claims 25-28, 30-34, 36-37, 50 and 52) Defendant directly infringes through at least the use of the LaundryCard system.

86.     Further, Defendant induces infringement of these claims (claims 25-28, 30-34, 36-37, 50 and 52) through its customers' use of the Laundry Card system. Defendant, as detailed above, had actual knowledge of the '947 patent through at least the Plaintiff's letter to Defendant alleging infringement. *See* Exhibit

M. Defendant also provides its customers with all of the hardware and software of the LaundryCard system to ensure that the LaundryCard system functions and operates as described in **Exhibit N**, which meets all of the limitations of the claims.

87.   Further, Defendant contributes to the infringement of the claims (claims 25-28, 30-34, 36-37, 50 and 52) as the Defendant had actual knowledge of the '947 patent through at least the Plaintiff's letter to Defendant alleging infringement. *See* Exhibit M. Further, the LaundryCard system has no substantial non-infringing use beyond the operation of the system as described in **Exhibit N**, which meets all of the limitations of the claims.

88.   Finally, Defendant's infringement through use of the LaundryCard system is willful given Defendant's knowledge of the '947 patent and Defendant's continuous and intentional infringement of the '947 patent in disregard of Plaintiff's rights in the '947 patent.

### Defendant's Use of the FasCard System

89.   Defendant has infringed and continues to infringe – directly, contributorily, and/or by active inducement – one or more claims of the '947 patent through its unauthorized use, and/or causing to be used, devices and/or systems and methods that embody or practice the inventions claimed in the '947 patent, such as Card Concepts Inc.'s FasCard system. For example, the FasCard system infringes the '947 patent through its unauthorized use of at least: method claims 1-8, and 10; method claims 11-18; method claim 19; method claim 20; method claim 21; method claim 22; method claim 23; method claim 24; apparatus claims 25, 28, 30; apparatus claims 31, 34, 36-37; method claims 38-40, 54; method claims 44-45, 55; and, system claims 50-51 **Exhibit O** attached hereto provides an explanation of how the FasCard system meets the limitations of the aforementioned claims either literally or pursuant to the doctrine of equivalents.

90.   With respect to the apparatus and system claims (claims 25, 28, 30-31, 34, 36-37 and 50-51) Defendant directly infringes through at least the use of the

1   FasCard system.

2        91.    Further, Defendant induces infringement of these claims (claims 25,

3   28, 30-31, 34, 36-37 and 50-51) through its customers' use of the FasCard System.

4   Defendant, as detailed above, had actual knowledge of the '947 patent through at

5   least the Plaintiff's letter to Defendant alleging infringement. *See* Exhibit M.

6   Defendant also provides its customers with all of the hardware and software of the

7   FasCard system to ensure that the FasCard system functions and operates as

8   described in **Exhibit O**, which meets all of the limitations of the claims.

9        92.    Further, Defendant additionally contributes to the infringement of the

10  claims (claims 25, 28, 30-31, 34, 36-37 and 50-51) as the Defendant had actual

11  knowledge of the '947 patent through at least the Plaintiff's letter to Defendant

12  alleging infringement. *See* Exhibit M. Further, the FasCard system has no

13  substantial non-infringing use beyond the operation of the system as described in

14  **Exhibit O**, which meets all of the limitations of the claims.

15       93.    Finally, Defendant's infringement through use of the FasCard system

16  is willful given Defendant's knowledge of the '947 patent and Defendant's

17  continuous and intentional infringement of the '947 patent in disregard of

18  Plaintiff's rights in the '947 patent.

19              **Defendant's Use of the FasCard Mobile App System**

20       94.    On information and belief, Defendant has infringed and continues to

21  infringe – directly, contributorily, and/or by active inducement – one or more

22  claims of the '947 patent through its unauthorized use, and/or causing to be used,

23  devices and/or systems and methods that embody or practice the inventions claimed

24  in the '947 patent, such as Card Concepts Inc.'s FasCard Mobile App system. For

25  example, the FasCard Mobile App system infringes the '947 patent through its

26  unauthorized use of at least: method claims 1-10; method claims 11-18; method

27  claim 19; method claim 20; method claim 21; method claim 22; method claim 23;

28  method claim 24; apparatus claims 25, 28, 30; apparatus claims 31, 34, 35, 36, 37;

method claims 38-43, 54; and system claims 50-51. **Exhibit P** attached hereto provides an explanation of how the FasCard Mobile App system meets the limitations of the aforementioned claims either literally or through the doctrine of equivalents.

95.     With respect to the asserted device and platform claims (claims 25, 28-31 and 34-37 and 50-51) Defendant directly infringes through at least the use of the FasCard Mobile App system.

96.     Further, Defendant induces infringement of these claims (claims 25, 28-31 and 34-37 and 50-51) through its customers' use of the FasCard Mobile App System. Defendant, as detailed above, had actual knowledge of the '947 patent through at least the Plaintiff's letter to Defendant alleging infringement. *See* Exhibit M. Defendant also provides its customers with all of the hardware and software of the FasCard Mobile App system to ensure that the FasCard Mobile App system functions and operates as described in **Exhibit P**, which meets all of the limitations of the claims.

97.     Further, Defendant additionally contributes to the infringement of the claims (claims 25, 28-31 and 34-37 and 50-51) as the Defendant had actual knowledge of the '947 patent through at least the Plaintiff's letter to Defendant alleging infringement. *See* Exhibit M. Further, the FasCard Mobile App system has no substantial non-infringing use beyond the operation of the system as describe in **Exhibit P**, which meets all of the limitations of the claims.

98.     Finally, Defendant's infringement through use of the FasCard Mobile App system is willful given Defendant's knowledge of the '947 patent and Defendant's continuous and intentional infringement of the '947 patent in disregard of Plaintiff's rights in the '947 patent.

99.     The acts of infringement of the '947 patent by Defendant have injured Upaid, and Upaid is entitled to recover damages adequate to compensate it for such infringement from Defendant, but in no event less than a reasonable royalty.

1    100.   Plaintiff is in compliance with 35 U.S.C. § 287.

2                          **PRAYER FOR RELIEF**

3          WHEREFORE, Plaintiff respectfully requests that this Court enter judgment

4    against Defendant and against its respective subsidiaries, successors, parents,

5    affiliates, officers, directors, agents, servants, employees, and all persons in active

6    concert or participation with it, granting the following relief:

7          1.     The entry of judgment in favor of Upaid and against Defendant that

8    Defendant has directly infringed and indirectly infringed (through inducement and

9    contributing to infringement) claims of the '947 patent, literally and/or under the

10   doctrine of equivalents pursuant to 35 U.S.C. §271;

11         2.     Permanently enjoin Defendant as well as its respective agents,

12   servants, officers, directors, employees and all persons acting in concert with them,

13   directly or indirectly, from infringing, inducing others to infringe or contributing to

14   the infringement of the '947 patent pursuant to 35 U.S.C. § 283;

15         3.     Order that Defendant account for and pay to Upaid the damages to

16   which Upaid is entitled as a consequence of Defendant's infringement of the '947

17   patent and to which available under 35 U.S.C. § 284, together with prejudgment

18   interest from the date infringement began;

19         4.     Find that Defendant's infringement is willful and accordingly award

20   Upaid enhanced damages in accordance with 35 U.S.C. § 284;

21         5.     Declare this case exceptional pursuant to 35 U.S.C. § 285 and award to

22   Upaid its reasonable attorney's fees, expenses and costs in this action;

23         6.     Award to Upaid post-judgment interest on the foregoing amounts at

24   the maximum rate recoverable by law; and

25         7.     Award to Upaid such other and further relief as the Court deems just

26   and proper.

27

28

COMPLAINT FOR
PATENT INFRINGEMENT                     - 28 -

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands a trial by jury on all issues so triable.

3

4

Dated:  April 30, 2018                    POLSINELLI LLP

5

6

7                                                  By:     /s/Chris L. Holm
                                                          Chris L. Holm
8                                                          POLSINELLI LLP
                                                          cholm@polsinelli.com
9                                                          Telephone:  (310) 556-1801

10                                                         Attorneys for Plaintiff
                                                           UPAID SYSTEMS, LTD.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR
PATENT INFRINGEMENT                           - 29 -